IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION


| | | |
|---|---|---|
| KINGSPORT CITY SCHOOL SYSTEM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:06-CV-234 |
| | ) | |
| J.R., by and through his parents, | ) | |
| RONNIE RENTZ and KAREN RENTZ, | ) | |
| | ) | |
| Defendants. | ) | |


## MEMORANDUM OPINION


      This civil action is before the court on "Plaintiff's Motion for Judgment on the Administrative Record" [doc. 18]. Defendants filed a response in opposition to the motion [docs. 24, 25]. On October 4, 2006, plaintiff filed a complaint appealing a portion of the final order of the Administrative Law Judge's ("ALJ") order that was entered August 8, 2006 [doc. 1]. Plaintiff originally requested that it be allowed to submit additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii). However, plaintiff moved to withdraw that request [doc. 20], which the court granted [doc. 26]. Therefore, this matter is before the court solely on the administrative record. 20 U.S.C. § 1415(i)(2)(C)(i).

# I.

## *The IDEA*

This case arises under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400 *et seq*. The purpose of the IDEA is to provide a free appropriate public education to children with disabilities. *N.L. ex rel. Mrs. C. v. Knox County Schs.*, 315 F.3d 688, 689 (6th Cir. 2003). School districts receiving funds under the IDEA must establish an Individualized Education Program ("IEP") for each child with a disability. *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 853 (6th Cir. 2004). "The IEP must contain a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating the child's progress." *Id.* (quotation marks and citation omitted). The school system must provide an IEP that is "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982). The goal of the IDEA is "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Id.* at 192. The IDEA "may not require public schools to maximize the potential of disabled students commensurate with the opportunities provided to other children." *Kings Local Sch. Dist. v. Zelazny*, 325 F.3d 724, 729 (6th Cir. 2003) (quoting *Renner v. Bd. of Educ.*, 185 F.3d 635, 644 (6th Cir. 1999)).

II.

The IDEA provides that a party aggrieved by the findings and decision of an administrative law judge has a right to bring a civil action in federal court. 20 U.S.C. § 1415(i)(2). The court shall receive the record of the administrative proceedings, hear additional evidence if the parties make such a request, and, basing its decision on the preponderance of the evidence, grant appropriate relief. *Id.* "Under IDEA, the district court uses a 'modified de novo' standard for reviewing state administrative determinations. This means that the district court should perform a de novo review, but it should give due weight to the state administrative proceedings in reaching its decision." *Doe v. Metro. Nashville Pub. Schs.*, 133 F.3d 384, 386 (6th Cir. 1998) (internal quotation marks and citations omitted).

"'Due weight,' however, does not mean that the reviewing court can simply adopt the findings of the state administrative officers." *Bd. of Educ. v. Patrick*, 9 F. Supp. 2d 811, 819 (N.D. Ohio 1998) (citing *Doe v. Bd. of Educ.*, 9 F.3d 455, 458 (6th Cir. 1993)). The Supreme Court has warned that the "'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206.

> The amount of weight due to administrative findings depends on whether the finding is based on educational expertise. Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation. More weight, however, is due to an agency's determinations on

3

matters for which educational expertise is relevant.

*Deal*, 392 F.3d at 849 (internal quotation marks and citations omitted).

The court has a two-part inquiry: (1) whether the school system complied with the procedures set forth in the IDEA and (2) whether the individualized program developed through the IDEA's procedures is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206-07. "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Id*. at 207. The party challenging the administrative finding has the burden of proof. *Bd. of Educ. v. Ill. State Bd. of Educ.*, 184 F.3d 912, 915 (7th Cir. 1999).

## III.

### *Background*

JR was first identified as a student with a disability when he was in the first grade as he had been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"). His elementary school years were marked with behavior difficulties that required special education instruction as well as treatment from physicians and therapists along with medications.

In 2003 he was identified as "learning disabled." However, his behavior and academic problems improved during middle school. By the end of eighth grade in the spring of 2004, JR's grades had improved to A's and B's, and his behavior was also improved

significantly.

A comprehensive evaluation was performed in the spring of 2004, and JR was continued as a special education student. An IEP for JR's freshman year in high school was developed that included a Behavior Plan. The Behavior Plan had been implemented near the end of the eighth grade year and provided in pertinent part:

> [JR] will refrain from name-calling and making inappropriate comments to peers. [JR] is to report any incidents to an adult.

> [JR] will refrain from contact with "identified students" from previous incidents of alleged conflict(s). This would include verbal/physical or third party contact. . . .

> [JR] will report alleged incidents of threats in a responsible manner.
> . . .
> The school will make provisions for scheduling regular meetings with identified contact individuals.

> The school will provide a supervised location for [JR] before and after regular school hours (7:50 a.m. - 2:35p.m.).

> The teachers will provide preferential seating when deemed appropriate. The school will provide proximity monitoring during class changes within the school day.

> The school will continue to contact Mr. or Mrs. Rentz to inform them of [JR's] progress, or if problems occur.

JR began high school in the fall of 2004. On September 7, 2004, he was involved in the first of several altercations with students. On that date he was assaulted by a student allegedly because JR called him a "faggot." The student was suspended and no

5

action was taken against JR as the school found no credible evidence of name-calling.

A second incident occurred on January 20, 2005, when JR and his former girlfriend were arguing in the school hallway. The girl was directed to the cafeteria. JR threw his backpack on the floor and said he was "going to kill the f. . . bitch." He proceeded into the cafeteria toward the former girlfriend at which time a school official removed him from the cafeteria. JR was suspended for three days.

On January 26, 2005, JR returned to school and reported that he had received threats from two female friends of his former girlfriend. The next day one of these girls assaulted JR at school. The girl admitted the assault but claimed it was because she had been told JR called her a "bitch" and a "whore." No action was taken against JR, but the female student was suspended for five days.

The male student who had assaulted JR in September 2004 assaulted him again on February 1, 2005, as retaliation for suspension of the female student who received the five-day suspension, who is his sister. The male student was suspended, sent to an alternative school, and placed in a self-contained behavior management classroom.

On February 8, 2005, JR was involved in an altercation near a supervised bus stop. It is disputed who initiated the altercation, but the other student assaulted JR. The other student involved was suspended for three days, and his parents removed him from school for home bound services.

6

In February 2005, JR's parents submitted to the school a Request For Homebound Services For Medical or Psychological Diagnoses. JR's medical doctor completed the form; however, the parties agreed that JR was removed from school because his parents believed his safety was at risk attending high school.

On March 2, 2005, the school system received a Due Process Hearing Request Form from JR's parents. They alleged that the school system had not complied with the current IEP and that it maintained a "hostile, dangerous, and harassing environment" that prevented their child from receiving a free appropriate public education ("FAPE").

JR's parents also filed criminal charges against the two male assailants and JR's former girlfriend. Juvenile court resolved these matters through a process known as "informal adjustment."

JR received homebound services through the remainder of his freshman year, with his academic performance being less than satisfactory. Before JR returned to school for his sophomore year, a meeting was held to discuss the terms of his return. At the meeting the parties discussed the Behavior Plan and its provision for proximity monitoring during class changes. The school proposed the use of escorts that it referred to as "shadows." The parties expressed a concern that the shadows might alienate JR from the other students. The school contends that the use of the shadows was a good faith effort to appease JR's parents and to allow him to return to school. JR's parent's contend that they were being threatened with truancy proceedings and had no real choice but to agree to the close monitoring with the

7

use of the shadows.

JR returned to school with the use of the shadows who accompanied him to and from class, the bathroom, and the cafeteria. JR was also directed to remain in specific locations before and after school. The shadows were employed part time and did not have education degrees or any certification in special education services. The shadows also attended class with JR, many times seated right next to him. The shadows took notes on JR's conduct throughout the school day and submitted those notes to the special education director. There is no indication that the notes were utilized in JR's education or to implement the Behavior Plan. Once JR returned to school, his grades improved significantly.

IV.

*Analysis*

Plaintiff appeals the portion of the ALJ's finding that JR's Behavior Plan was insufficient to improve his social interaction with his peers and failed to provide a "free appropriate education" as required by the IDEA. Plaintiff also appeals the ALJ's finding that JR is the prevailing party that entitles defendants to an award of attorney's fees under the IDEA, 20 U.S.C. § 1415(i)(3)(B)(i). There is no contention that procedures under the IDEA were not followed.

8

<u>IEP and Behavior Plan</u>

The ALJ determined that the Behavior Plan was "grossly insufficient to accomplish its goals and the goal to improve [JR's] interaction with his peers . . . ." She also found that the use of shadows greatly impeded JR's progress toward this goal. The ALJ further concluded that the reporting requirements in the Behavior Plan placed a burden on JR and that the Behavior Plan called for the school to schedule regular counseling sessions but it did not do so. Plaintiff argues that these rulings are in error because they are not supported by the factual record and because the ALJ impermissibly substituted her own notions of proper educational methodology for the judgment of JR's IEP team in violation of *Board of Education v. Rowley*, 458 U.S. 176 (1982).

The court has considered the record and the findings and conclusions of the ALJ and concludes that her rulings were not in error. The court is somewhat puzzled at plaintiff's contention that the ALJ's assessment of the Behavior Plan and use of the shadows was based "solely" on her own notions of appropriateness. The ALJ set out in her opinion the testimony of plaintiff's own expert regarding the use of the shadows, the reporting burdens in the Behavior Plan, and the need for regular counseling. She then relied on that testimony as well as other parts of the record for her conclusions that the Behavior Plan was insufficient.

9

Dr. Greer, a board certified adult, child and adolescent psychiatrist, testified for the school system. He opined that the use of shadows for JR was not appropriate in that they denied him the opportunity to learn how to negotiate the give and take of socializing and dealing with others. He also opined that their presence caused JR to become dependent upon them which operated "against the independence that he's developed over the years where he's just blossomed in the middle years . . . ." Dr. Greer testified that he would endorse such a program to protect a student from assaults but he would prefer a transfer to another school over their use.

Dr. Greer was also questioned about the reporting requirement in the Behavior Plan and stated that it "could be a burden." He stated that there needed to be a distinction between reporting every slight and "serious teasing or something that's really wrong." He also expressed the opinion that reporting every slight can create an atmosphere where some individuals would provoke JR just so he would have to report it and that the reporting takes on a life of its own.

Dr. Greer also recommended that JR's Behavior Plan contain a provision for regular counseling with a designated person. The teachers that testified at the hearing had not referred JR for counseling, and no counseling had occurred after any of the incidents involving assaults, fighting, or loss of temper.

After finding that there was no evidence to support a finding of bullying, the ALJ concluded:

> There is, however, significant evidence from which to conclude that the use of the shadows, the reporting burdens placed on the student and the omission of regular counseling sessions prevented the student from improving his social interaction with his peers. The testimony as a whole, but that of Dr. Greer in particular, clearly established that the student needs to learn self control and how better to interact with his peers.

The ALJ based her conclusions on the entire record, including the testimony of Dr. Greer, not "solely" on her "own notions of appropriateness."

Having performed the required review, the court concludes that the ALJ's findings of fact and conclusions are entitled to great deference. The due process hearing was extensive and comprehensive and involved numerous witnesses and many exhibits. The ALJ's order reflects an analysis and consideration of the entire record, and her conclusions are supported by the record and expert testimony. Accordingly, the court affirms and adopts the ALJ's findings and conclusions.

## Prevailing Party Status

Defendants appeal the ALJ's finding that JR is the prevailing party and therefore entitled to attorney's fees. Reasonable attorney's fees and costs are available to parents or guardians who are successful in enforcing a child's rights under the IDEA. 20 U.S.C. § 1415(i)(3)(B). The parent or guardian must be the "prevailing party" within the

meaning of the IDEA in order to qualify for recovery of attorney's fees and costs. *Id.*

Section 1415(i)(3)(B) provides:

> In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs - -
>
> (I) to a prevailing party who is the parent of a child with a disability.

Defendants may be considered prevailing parties if they "succeed on any significant issue which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Echerhart*, 461 U.S. 424, 433 (1983). "The 'touchstone' of this inquiry is 'the material alteration of the legal relationship of the parties.'" *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 526 (6th Cir. 2003) (quoting *Tex. Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792-93 (1989)); *see also Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992) ("[A] plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff."). The change in the legal relationship between the parties must also be a court-ordered change. *Tompkins ex rel. A.T. v. Troy Sch. Dist.*, 199 F. App'x 463, 466 (6th Cir. 2006). In order for the defendants herein to be prevailing parties under the IDEA and eligible for attorney's fees, "they must have (1) succeeded on a significant issue, and (2) this success must be embodied in either a judgment on the merits or in a settlement agreement enforced through a consent decree (i.e., an agreement with 'the necessary judicial imprimatur')." *Id.*

The defendants are entitled to prevailing party status. Although they did not prevail on all the issues they had before the ALJ, i.e., the bullying and request for a transfer to another school, they prevailed on issues concerning the Behavior Plan and use of the shadows. The ALJ's decision altered the relationship of the parties because she ordered that the Behavior Plan be modified in several specific ways. Therefore, the ALJ's finding that JR's parents are prevailing parties will be affirmed.

Plaintiff argues that because JR moved from the Kingsport City School System this matter is moot. JR's departure from the school system affects implementation of the relief ordered by the ALJ concerning modification of the Behavior Plan. However, defendant made no meaningful argument that mootness affects the prevailing party status of JR's parents.

For the reasons stated herein, the ALJ's decision will be affirmed. "Plaintiff's Motion for Judgment on the Administrative Record" [doc. 18] will be denied. An order consistent with this opinion will be entered.

ENTER:

                    _____
                       s/ Leon Jordan
                    United States District Judge